UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                  :

FEDERAL INSURANCE COMPANY,    :
                                  :

             Plaintiff,    :
                                  :             07 Civ. 2415 (GEL)

     -against-          :
                                  :        **OPINION AND ORDER**

GREAT WHITE FLEET (US) LTD., et al.,  :
                                  :

             Defendants.  :
------------------------------------------------------x

David L. Mazaroli, New York, NY, for plaintiff.

Gregory Barnett, Casey & Barnett, LLC, New
York, NY, for defendant Great White Fleet.


GERARD E. LYNCH, District Judge:

      Federal Insurance Company ("Federal Insurance"), as insurer and subrogee[1] of Yak Pak

El Salvador de C.A. and Yak Pak (collectively "Yak Pak"), brings this action against Great

White Fleet (US) Ltd. ("GWF") for the value of a shipment of guitar straps and other musical

accessories lost while in GWF's agent's possession during the Central American inland portion

of a shipment that was to include ocean carriage from Guatemala to Texas.  Although discovery

is not yet complete, GWF now moves for summary judgment, claiming that a bill of lading

issued July 30, 2006, absolves GWF of liability for the loss, and, in the alternative, limits its

liability to $500 for the contents of the container.  Since the clause absolving GWF of liability is

_____

    [1] "Subrogation" is "the substitution of the insurer in place of the insured for the purpose
of claiming indemnity from a third person for the loss covered by insurance."  Great Am. Ins.
Co. v. United States, 575 F.2d 1031, 1034 (2d Cir. 1978) (citation and internal quotation marks
omitted).  It is "based upon the principle of indemnity but is an exclusively derivative remedy
which depends upon the claim of the insured and is subject to whatever defenses the tortfeasor
has against the insured."  Id. (citation omitted).

ambiguous, it does not govern here. Moreover, the clause limiting GWF's liability cannot be held to govern at this stage of the case because on the present record a reasonable factfinder could conclude that Yak Pak had neither notice of the clause (or the other terms in the bill of lading) nor an opportunity to declare a higher value and receive extra coverage for the cargo. Therefore, this pre-discovery motion for summary judgment must be denied.

## BACKGROUND[2]

Yak Pak contracted with GWF, a common carrier, for a "door to door" shipment of music accessories from San Salvador, El Salvador to Houston, Texas. Chiquita Logistics Services El Salvador Ltda. ("Chiquita") operated as GWF's agent and helped to arrange the shipment. Prior to the voyage, Chiquita memorialized the details of the shipment in an undated shipping order. (Affidavit of David Mazaroli, dated March 20, 2008, ("Mazaroli Aff.") Ex. A ("Shipping Order").) In San Salvador, Yak Pak loaded the goods into a GWF shipping container and sealed it, and on July 28, 2006, a trucker, acting as GWF's agent, picked up the container. The contemplated shipment was intermodal (or multimodal) in that it included both sea and land components; the trucker was to drive the container to Puerto Barrios, Guatemala, where GWF or an agent was to place it on a ocean tanker and ship it to Freeport, Texas, and then transport it to Houston. However, the container never made it to Puerto Barrios. On July 30, 2006, after the loss of the cargo, GWF issued the bill of lading. (Declaration of Gregory G. Barnett, dated February 19, 2008, ("Barnett Decl.") Ex. 1 ("BOL").)

---

[2] Since GWF moves for summary judgment, the Court makes no factual findings, but views the facts in the light most favorable to Federal Insurance, the nonmoving party. Therefore, except as otherwise noted, the facts discussed are either undisputed or presented in the light most favorable to Federal Insurance.

Defendant claims that the shipment was hijacked. (D. Rule 56.1 Stmt. ¶ 6.) Yak Pak, which had separately insured the cargo through Federal Insurance, sought indemnification, claiming that the container was stolen in transit to Puerto Barrios. (Barnett Decl. Ex. 4.) Federal Insurance indemnified Yak Pak, and then, as a subrogee of Yak Pak, sued GWF for the value of the shipment, claiming that the loss was caused by GWF's negligence.[3] The case was filed in state court in California, subsequently removed to federal court, and then transferred to this district.

### 1. Shipping Order and Bill of Lading

The undated shipping order identifies 2,299 "PKGS," or packages, 249 of which contain "shoulder bags" and 2,050 of which contain "guitar straps," to be shipped in a container. (Shipping Order.) In the "TOTAL $ FOB or CIF" column, $72,848.90 is declared. (Id.)[4] A reasonable factfinder could conclude that this amount constituted the declared value of the shipment. The front of the bill of lading also describes the shipment as 2,299 boxes – or packages – of shoulder bags and guitar straps. (BOL.) Both the bill and the shipping order state

---

[3] Federal Insurance also sued BAX Global, Inc., and Bax Global Lines, but the Court dismissed those parties from the case on the consent of all parties soon after the case was transferred to this district.

[4] A CIF (cost, insurance, freight) contract is one where, in consideration for the purchase price, the seller "is bound to arrange for the carriage of the goods to their agreed destination, for insurance upon them for the benefit of the buyer, and either to pay the cost of the carriage and insurance or allow it on the purchase price." Warner Bros. & Co. v. Israel, 101 F.2d 59, 60 (2d Cir. 1939). "[U]nder a CIF contract [ ] the seller fulfills his obligation simply by loading the cargo and forwarding to the buyer a bill of lading and insurance certificate." New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 129 (2d Cir. 2001) (citations and internal quotation marks omitted). "F.O.B. or Free on Board means that title to property passes from the seller to buyer at the designated FOB point." Berisford Metals Corp. v. S.S. Salvador, 779 F.2d 841, 843 (2d Cir. 1985) (citations omitted). The contours of these concepts are irrelevant for the purposes of this motion.

that the packages were to be shipped in a GWF container (TRLU 522280-0), a "40Dry" or "40 HC" container (id.; Shipping Order), apparently referring to a forty-foot-long "high cube" shipping container for the storage and transport of dry goods.  The bill lists San Salvador as the place of receipt of the shipment; Puerto Barrios, Guatemala as the port of loading; Freeport, Texas as the port of discharge; and Houston, Texas as the place of delivery.  (BOL.)  In both the bill and the shipping order, the transport was door-to-door.  (Id.; Shipping Order.)  However, unlike the shipping order, the bill contains no declaration of value; the "Declared Value $" column of the bill was left blank.  (BOL.)

The back of the bill contains numerous clauses in small print, none of which appear in the shipping order.  Three in particular are relevant to this dispute.   Clause Four provides that "[w]here the Carrier has possession and custody of the cargo during any time other than the Ocean Carriage, Carrier's liability shall be governed by COGSA, as amended by this Bill of Lading. . . ."  (Id. Clause 4(b).)  Clause Nineteen limits the liability of the common carrier and its agents "for any loss or damage to or in connection with the shipment in an amount exceeding U.S. $500 per Package" (id. Clause 19(a)), a fairly standard limitation in the shipping industry.  However, the clause goes on to provide that "the container shall be deemed the package for the purpose of the $500 per package limitation" if the shipment is lost during "any portion of the transport other than the Ocean Carriage, or where the Merchant is unable to determine whether the loss and/or damage took place during the Ocean Carriage."  (Id. Clause 19(c).)  Clause Thirteen limits GWF's liability even further, absolving GWF of liability for cargo loss in certain circumstances, providing that:

In some Central American ports, the Carrier[5] or its agents may require the Merchant[6] to use certain Inland Carriers[7] to safeguard the Carrier's containers. In these instances, the Merchant has the option of unloading their cargo from the Carrier's container or agreeing to use the Inland Carrier arranged by the Carrier or its agents. Should the Merchant agree to use the Inland Carrier arranged by the Carrier or its agents, the Carrier is under no obligation or liability under the bill of lading for any damage or loss to the Shipment during the inland transportation.

(BOL Clause 13.)

2.      Parties' Contentions

GWF reads these provisions together to mean that it is completely absolved of liability for loss or damage to the cargo arising from land transport to Puerto Barrios, Guatemala, and that its liability is limited to $500 for the entire container during all (other) non-ocean-carriage portions of intermodal transport. GWF acknowledges that, had the loss occurred at some point after the goods were loaded but before they were discharged from the ship, the bill, when read in tandem with the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 note ("COGSA"),[8] would

---

[5] The carrier is "Great White Fleet (US) Ltd., the Vessel, and the Vessel's owner, operator and master." (BOL Clause 2(a).)

[6] Merchant means "the Shipper, Consignee, Receiver, any holder of this Bill of Lading, the owner of the Shipment, and anyone entitled to possession of the Shipment." (BOL Clause 2(b).) In this context, the shipper was Yak Pak El Salvador de C.A. and the consignee was Yak Pak.

[7] Inland Carrier includes "any inland trucker . . . and/or any other person employed to transport the Shipment between the Vessel and an Interior Point." (BOL Clause 2(g).)

[8] COGSA was previously codified at 46 U.S.C. §§ 1300-1315. In 2006, Congress recodified Title 46 of the U.S. Code, and since that date COGSA has been uncodified, but is reprinted at 46 U.S.C. § 30701, historical and statutory notes. See Pub. L. No. 109-304, 120 Stat. 1485 (2006).

prevent GWF from limiting its liability below $500 for each of the 2,299 packages listed on the front of the bill, or $1.1 million for the loss.[9]

Federal Insurance opposes GWF's motion on three grounds. First, it insists that COGSA (and, in the alternative, other federal law) prevents GWF from contractually absolving itself of liability for negligence. (P. Opp. 3-6, 7-8.) Second, Federal Insurance argues that, as a matter of contract and federal law, the appropriate "package" for all phases of the voyage is not the container (of which there is one), but the box (of which there are 2,299). (Id. at 6-7.) Third, it argues that GWF has failed to demonstrate that Yak Pak knew of the liability limitation and waiver provisions and could have obtained full coverage from GWF at a reasonable charge by declaring the cargo's excess value. (Id. at 8.)

For the reasons set forth below, even assuming the bill of lading is enforceable against Federal Insurance, the liability waiver is sufficiently ambiguous that on the present record it cannot be held as a matter of law to absolve GWF of liability for the loss. Moreover, although the bill is best construed to define the relevant "package" as the container for inland carriage, thereby limiting recovery to $500 for the entire shipment, and although such a limitation does not offend otherwise applicable federal law, there is nonetheless a factual dispute regarding whether Yak Pak had notice of these provisions and a reasonable opportunity to secure additional coverage through GWF, which precludes GWF from enforcing the $500 per container liability limitation at this stage in the proceedings. Summary judgment must thus be denied.

---

[9] This restriction on GWF's ability to limit its damages has less practical effect on this case than may initially appear, as the complaint alleges approximately $131,000 in damages, and Federal Insurance can recover only for losses actually sustained. See The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 497 (1935).

**DISCUSSION**

I.    <u>Summary Judgment Standards</u>

Summary judgment shall be granted if "there is no genuine issue as to any material fact"

such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A

"genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in

favor of the nonmoving party.  <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d Cir. 2001).  In

deciding a motion for summary judgment, the Court "resolve[s] all ambiguities and draw[s] all

reasonable inferences in the light most favorable to the party opposing the motion," <u>Cifarelli v.</u>

<u>Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996), and does not make any credibility assessments or weigh

the evidence, <u>Weyant v. Okst</u>, 101 F.3d 845, 854 (2d Cir. 1996).

Although a party may move for summary judgment "at any time," Fed. R. Civ. P. 56(b),

pre-discovery summary judgment is the exception rather than the rule and will be granted "only

in the clearest of cases." <u>Kleinman v. Vincent</u>, 1991 WL 2804, at *1 (S.D.N.Y. Jan. 8, 1991);

<u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); Moore's Federal Practice, ¶ 56.15[5] at

56-308 n. 28 (1993 & Supp. 1994).  Under Fed. R. Civ. P. 56(f), a pre-discovery summary

judgment on a properly supported record may nonetheless be inappropriate where the party

opposing it shows that due to inadequate discovery it cannot "present facts essential to justify

[his] opposition" that could be uncovered by additional discovery.  <u>See</u> <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 250 n. 5 (1986).  In deciding whether to grant summary judgment on

such a record, a court must consider:

> (1) whether the lack of discovery was in any way due to fault or
> delay on the part of the nonmovant; (2) whether the nonmovant
> filed a sufficient Rule 56(f) affidavit explaining: (i) what facts are
> sought and how they are to be obtained, (ii) how those facts are

> reasonably expected to create a genuine issue of material fact, (iii)
> what effort the affiant has made to obtain them, and (iv) why the
> affiant was unsuccessful in those efforts; and (3) whether the
> nonmovant provided any basis for its belief that further discovery
> would alter the outcome of the summary judgment motion.

Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 360

(S.D.N.Y. 2002), citing Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996); Meloff v. New

York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

II.     Scope of Maritime Jurisdiction and Federal Common Law

        "When a contract is a maritime one, and the dispute is not inherently local, federal law

controls the contract interpretation." Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S.

14, 22-23 (2004), citing Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961). "[S]o long as a

bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime

commerce – and thus it is a maritime contract," regardless of whether "it also provides for some

land carriage." Kirby, 543 U.S. at 27; accord Sompo Japan Ins. Co. v. Union Pacific R.R. Co.,

456 F.3d 54, 71 n.17 (2d Cir. 2006). The bill here required a "substantial" sea voyage from

Guatemala to Texas, and as there is no suggestion that the case is "inherently local," it is

therefore a maritime contract governed by federal law, including federal common law. Federal

common law "plays a more prominent role in the maritime context than in others . . . [but]

nevertheless only applies in the absence of a relevant statute." Sompo, 456 F.3d at 74; see also

Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 555 (2d Cir.

2000) (applying federal common law developed in admiralty to a maritime contract for intermodal shipment where loss occurred in Belgium).[10]

III.    Contract Interpretation

A.    General Principles

As a general rule, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." Kirby, 543 U.S. at 16. "Effect should be given to all the contract terms and the specific controls the general." J. Aron & Co. v. Askvin, 267 F.2d 276, 277 (2d Cir. 1959) (citations omitted); see also Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d 807, 822-23 (2d Cir. 1981). Where a bill of lading is ambiguous, "an interpretation that gives a reasonable and effective meaning to all terms of a [bill] is preferable to one that leaves a portion of the writing useless or inexplicable," Hartford, 230 F.3d at 558; the Court's "task . . . is to construe the contract to give consistent effect, if possible, to all of its terms," Pannell v. United States Lines Co., 263 F.2d 497, 498 (2d Cir. 1959). However, bills of lading are "contracts of adhesion and, as such, are strictly construed against the carrier." Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 482 (2d Cir. 1985); Monica Textile Corp. v. S.S. Tana, 952 F.2d 636, 643 (2d Cir. 1991); Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 15 (2d Cir. 1969); Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d 720, 722 (2d Cir. 1963). Furthermore, where two provisions conflict or cannot be read in harmony, a court should "attribute greater effect to inserted written words than to the printed part of such a contract,

_____

[10] The bill also selects federal law as the appropriate body of law to resolve the dispute. (BOL Clause 23).

because they are the terms presently chosen by the parties, whereas the others are but a general formula." The Halo, 52 F.2d 136, 137 (2d Cir. 1931).

B.      COGSA Extended By Contract

COGSA "restricts a carrier's ability to limit its liability under its bill of lading" by establishing a "minimum floor" of $500 per package or customary freight unit, beneath which a carrier may not limit its liability for losses attributable to its negligence. General Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1024 (2d Cir. 1987). The $500 per package floor also operates as a ceiling on a shipper's recovery for lost or damaged cargo, except where the shipper declares a higher value for its goods. Id. By federal "common law principles," in order for the $500 per package to operate as a ceiling on recovery, the carrier must have provided the shipper with a "fair opportunity" to declare the excess value of the cargo. Id.

As a federal statute governing international "carriage of goods by sea," COGSA § 2, COGSA by its terms applies to the "period from the time when the goods are loaded on to the time when they are discharged from the ship," COGSA § 1(e), the "so-called 'tackle-to-tackle' period" of the voyage, Sompo, 456 F.3d at 58. See also Seguros Illimani S.A. v. M/V Popi P, 929 F.2d 89, 93 (2d Cir. 1991). As the cargo was reported lost before being loaded on the ship (P. Rule 56.1 Stmt. ¶ 6), COGSA does not apply of its own force to the incident at issue here.

Nevertheless, COGSA "contemplates that parties will enter into agreements extending COGSA's terms beyond the tackle-to-tackle period," Sompo, 456 F.3d at 58, and parties often agree to contract terms that incorporate the substantive provisions of COGSA to govern other portions of an intermodal shipment. The bill of lading here does exactly that, extending COGSA to portions of the voyage where it would not otherwise apply. (BOL Clause 4(b).) GWF

acknowledges that, under the terms of contract at issue here, COGSA applies "where the carrier has possession and custody of the cargo during any time other than the Ocean Carriage," but insists that for such carriage, COGSA applies only "as amended by" other provisions of the bill of lading (see BOL Clause 4(b)), such as the bill's more extensive liability waiver. In contrast, Federal Insurance argues that "even where it is contractually extended, COGSA applies with statutory force," thereby prohibiting the liability waiver and the liability limitation from having any effect. (P. Opp. 8.)

Federal Insurance's argument fails, however, as the Second Circuit has explicitly rejected it. Where it does not apply of its own force, and operates merely "[a]s a rule adopted by and in a contract, COGSA is modifiable by other language contained in the bill of lading," and "the extent of any application beyond the scope of the statute is a matter of contract." Hartford, 230 F.3d at 557 (citation omitted). See also Sompo, 456 F.3d at 69 ("[C]ourts have consistently held that when COGSA is extended by contract beyond the tackles . . . the statute does not apply of its own force, or ex proprio vigore, but rather as a contractual term."); Pannell, 263 F.2d at 498 ("Where a statute is incorporated by reference its provisions are merely terms of the contract evidenced by the bill of lading.") If COGSA applied with statutory force to the loss at issue here, the liability waiver and $500 per container liability limitation might well be invalid.[11]

_____

[11] The container limitation and liability absolution provisions here would not necessarily be invalid under COGSA. Regarding the former, COGSA does not necessarily preclude deeming the container to be the relevant package. Despite a "traditional reluctance to treat a container as a COGSA package," a court will nonetheless do so "when the bill of lading expressly refers to the container as one package, or when the parties fail to specify an alternative." Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam, 759 F.2d 1006, 1015 (2d Cir. 1985). Regarding the latter, an absolution clause may be valid insofar as it absolves the carrier for losses not attributable to its negligence. See Bank of Kentucky v. Adams Express Co., 93 U.S. 174, 181 (1876); Anvil Knitwear, Inc. v. Crowley Am. Transp., Inc., No. 00 Civ.

However, the Second Circuit has rejected the proposition "that because the [liability clause] would be void when applied to shipments covered by the [COGSA], it should likewise be ineffective . . . where the Act is not operative as a matter of law." Pannell, 263 F.2d at 498.

Federal Insurance next argues that the "except as amended" clause of the bill of lading is "a nullity in the absence of express provisions distinguishing the clauses which are intended to amend COGSA and those which relate to matters outside of the scope of COGSA." (P. Opp. 5.) This argument is equally unpersuasive. The bill's "except as amended" clause is indistinguishable from the similar clause at issue in Hartford. See 230 F.3d at 557 (noting that the bill of lading "provides that COGSA applies '[e]xcept as otherwise provided herein'"). Sophisticated parties are presumed to know the scope and applicability of COGSA, and would know when the bill's provisions would conflict with COGSA as contractually extended. In those circumstances, the bill's provisions (as specific terms agreed to by the parties) necessarily operate as amendments to COGSA (as generally incorporated by reference), and prevail over the incorporated COGSA provisions, in accordance with the longstanding principle that "the specific controls the general." J. Aron, 267 F.2d at 277. Contracting parties could, of course, copy directly into the bill selected portions of COSGA, omitting or amending others as they wished. Such a process, however, would be unduly burdensome, complicating the drafting process and making bills of lading even longer (and less comprehensible) than they are now. Nothing prohibits parties from taking the simpler and more efficient course of incorporating COGSA as a

3243, 2001 WL 856607, at *4 (S.D.N.Y. July 27, 2001). See also note 12 below. Since COGSA does not apply here of its own force, it is unnecessary to decide what effect it would have if it did.

whole, except where its terms are trumped by specifically agreed-upon contract terms inconsistent with COGSA provisions.

Federal Insurance provides no authority supporting its proposed rule of contract construction, and cannot distinguish the clause at issue here from the one at issue in Hartford. Because this proposed rule is unsupported in law and undesirable in practice, it is rejected.

### C.    Interpreting the Bill of Lading

As the starting point in resolving the dispute must be not COGSA, but the bill of lading itself, the Court will first construe the bill and then determine whether it is enforceable.

#### 1.    Absolution Clause

GWF first argues that Clause Thirteen completely absolves it of liability. That argument fails, however, because ambiguities in a contract must be construed against the drafter. Allied, 775 F.2d at 482. The absolution clause only applies in those "instances" where "certain Inland Carriers" transport goods to "some Central American ports" (BOL Clause 13), and it is not clear from the bill (drafted by GWF) or from any other evidence in the record that Puerto Barrio, Guatemala is one such port. Furthermore, to trigger the provision, the carrier must "require" that the shipper use a particular inland carrier selected by GWF. (Id.) Although GWF may have selected the inland carrier, it is unclear on the present record that GWF "required" Yak Pak either to use this inland carrier or to assume responsibility for the inland transport itself. Whether this provision applies to absolve GWF of liability is at best a factual issue that cannot be resolved in GWF's favor at this point in time. Therefore, the motion for summary judgment

on the ground that GWF is necessarily absolved of liability for the loss of cargo must be denied.[12]

           2.      $500 Per Container Liability Limitation Clause

GWF argues in the alternative that Clause Nineteen properly redefines the relevant "package" (for purposes of the $500 limitation) from each box (of which there are 2,299) to each container (of which there is one) for the inland carriage. Federal Insurance argues that the Court should ignore the "boilerplate text in the pre-printed terms on the back of the GWF bill of lading form" redefining the term "package" for the inland carriage, and focus on the "word-processed definitions, tailored to the shipment in suit," providing that each of the 2,299 boxes housed in the container shall be the relevant packages for the $500 liability limit. (P. Opp. 6.)

---

[12] It is unnecessary to decide at this point, therefore, whether the liability waiver would be enforceable, were it to apply as a matter of contract. However, as a general rule, federal maritime law disfavors complete disclaimers of liability. See The Ansaldo, 294 U.S. at 497. A common carrier has a duty to transport and deliver cargo safely, and "cannot, by any contract with his customers, relieve himself from responsibility for his own negligence or that of his servants; and this because such a contract is unreasonable and contrary to legal policy." Bank of Kentucky, 93 U.S. at 181; Caterpillar, 318 F.2d at 724. Nevertheless, a carrier can "exempt himself by contract from liability for the consequences of events beyond his control." The Ansaldo, 294 U.S. at 496-497; see, e.g., Fruit of the Loom v. ARAWAK Caribbean Line Ltd., 126 F. Supp. 2d 1337, 1349 (S.D. Fla. 1998) (upholding a narrow provision absolving liability of carrier in the case of theft because it does not absolve carrier of its own negligence). Although the focus of the liability waiver at issue here may be to protect the carrier from losses that occur outside of its control (i.e., on roads with dangers sufficient that the cargo must be "safeguard[ed]"), by its terms the clause absolves the carrier for all losses, including those due to its own negligence. But even assuming the provision cannot operate to absolve the carrier of liability for losses due to its negligence, it may be enforceable to the extent that the actual loss sustained was not attributable to the negligence of the carrier or its agents. See Bank of Kentucky, 93 U.S. at 183; Anvil Knitwear, 2001 WL 856607, at *4. Here, evidence in the record supports the conclusion that the cargo was hijacked. Federal Insurance neither contests that conclusion nor offers evidence that the robbery was caused by GWF's negligence. Therefore, it is by no means clear that, were the clause applicable and the bill enforceable, the liability waiver would be invalid insofar as it absolved GWF from the losses at issue here.

Of course, where two provisions directly contradict each other, the particular and hand-written, or transaction-specific, will control the general and "boilerplate." See, e.g., The Halo, 52 F.2d at 137. For example, a hand-written provision on the front of the bill providing that "at all times the relevant package shall be each of the 2,299 boxes" would control over a pre-typed provision on the back of the bill providing that "at all times the relevant package shall be the container." The provisions here, however, do not directly negate each other. Construing the bill as a whole, the transaction specific terms and the pre-printed terms can be read in tandem to provide for a graduated liability scheme in which the carrier assumes greater liability for the ocean portion of the voyage than the inland portion. As the Second Circuit has recently emphasized, "an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." Hartford, 230 F.3d at 558. The bill generally defines the package as the box, but specifically provides that, where the cargo is being moved inland, the package shall be the container. See, e.g., Pannell, 263 F.2d at 498 ("We see no reason why this specific definition [of package] should not prevail over the general term 'package' . . . .").

The principle that all contractual terms should be given meaning can of course be unduly "exaggerate[d]." Allstate Ins. Co. v. St. Paul Fire & Marine Ins. Co., No. 83 Civ. 3198, 1984 WL 1969, at *3 (S.D.N.Y. Nov. 30, 1984) (Leval, J.). Since a court's task is "to enforce contracts in accordance with the probable intention of the contracting parties," there is no "rigid rule" that would prevent a "standard clause on a standard printed form" from being read as "overridden by an explicit typed rider, expressly created for the circumstances." Id. citing, inter alia, Hagan v. Scottish Ins. Co., 186 U.S. 423, 428 (1902); The Halo, 52 F.2d at 136; Standard

Oil Co. v. St. Paul Fire & Marine Ins. Co., 59 F. Supp. 470, 474 (S.D.N.Y. 1945).  Clause

Nineteen looks to be a standard provision in GWF's bill not expressly created for the

circumstances, and had it disemboweled the definition of "package" specifically agreed to by the

parties on the front of the bill in evident discord with the "probable intention of the contracting

parties," Allstate, 1984 WL 1969, at *3, it would not govern.

    Here, though, Clause Nineteen does not clearly undermine the specific agreement of the

parties, but can be read to give that agreement its contours.  The primary definition (package =

box) still operates during the primary leg of the shipment, the ocean carriage, and gives the

shipper significant protection.  Had the goods been lost at sea due to GWF's negligence, Federal

Insurance could recoup up to $1.1 million dollars in actual losses.  The secondary leg of the

journey, the inland transport, is qualitatively different from the ocean carriage, and two

sophisticated parties may very well wish to assume different levels of risk for different portions

of the intermodal carriage.  It may be small consolation to Federal Insurance that the bill affords

substantial protection for hypothetical losses at sea, where the actual loss occurred on land.

However, parties are generally deemed to be bound by the terms of their agreement, and it is not

the duty of this Court, in the absence of an otherwise applicable federal law, to rewrite an

otherwise valid contract where the provisions, as here, do not appear to be commercially

unreasonable or clearly contrary to the probable intent of the parties as expressed in the bill.

    The terms of the bill having been construed to limit GWF's liability to $500 per container

during inland portions of the voyage, the Court must determine whether the contract is

enforceable.  Federal Insurance suggests that the bill is unenforceable because it violates

otherwise applicable federal law, the Harter Act, 46 U.S.C. § 30704 et seq.,[13] and because Yak Pak had no notice of the liability limitation and "could [not] have declared the value of [the shipment] and had full protection against damage by paying a higher freight rate." Pannell, 263 F.2d at 498. Each is examined in turn.

        D.     The Harter Act

        1.     Generally

Federal Insurance asserts that the provision of the bill of lading that caps GWF's liability at $500 per container during any inland voyage violates the Harter Act.[14] The argument is without merit. The Harter Act, enacted in 1893, see 27 Stat. 445 (1893), regulates, among other things, a shipper's contractual limitation of liability. COGSA, enacted in 1936, see 49 Stat. 1207 (1936), supersedes the Harter Act with respect to "the tackle-to-tackle period of international shipments." Sompo, 456 F.3d at 70 n.15. Although COGSA "sharply curtailed the applicability of the Harter Act," the Harter Act still governs where COGSA does not – during the period "prior to loading and after discharge of cargo until proper delivery is made." Allied, 775 F.2d at 482; Sompo, 456 F.3d at 71; Wemhoener Pressen v. Ceres Marine Terminals, Inc., 5 F.3d 734, 739 (4th Cir. 1993). The Harter Act "govern[s] the carrier's duties in international shipments prior to the time when the goods are loaded on the ship and after the time they are discharged

---

[13] In 2006, Congress recodified the Harter Act (previously codified at 46 U.S.C. §§ 190-196) at 46 U.S.C. §§ 30701-07. See Pub. L. No. 109-304, 120 Stat. 1485 (2006).

[14] Because Clause Thirteen (absolving GWF of liability for certain inland voyages in Central America) does not apply at least at this stage, the Court need not decide whether that provision would violate the Harter Act. However, for reasons similar to those discussed in note 12 above, it is not clear that the waiver would govern insofar as it absolves GWF of liability for the losses at issue here. See Bank of Kentucky, 93 U.S. at 183; Anvil Knitwear, 2001 WL 856607, at *4.

from the ship, until 'proper delivery.'" Sompo, 456 F.3d at 70 n.15.  The Harter Act "has the effect of preserving the common law duty of a carrier to exercise due care in all handling of cargo, even when there are contrary contractual provisions."  Gordon H. Mooney, Ltd. v. Farrell Lines, Inc., 616 F.2d 619, 623 (2d Cir. 1980).  As a general rule, a bill of lading cannot "have the force of statute with the capability to supersede federal law," Sompo, 456 F.3d at 71, and, to the extent the Harter Act applies, it governs notwithstanding contrary provisions in the bill, see, e.g., English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard, 814 F.2d 84, 88 (2d Cir. 1987) (holding clause void as it would "eliminate the operation of the Harter Act upon foreign trade").  The Court must therefore determine, first, whether the Harter Act applies, and second, if it applies, whether it invalidates the $500-per-container liability cap.

### 2. Scope of the Harter Act

The Harter Act "applies to a carrier engaged in the carriage of goods to or from any port in the United States," 46 U.S.C. § 30702,[15] and forbids carriers from "insert[ing] in a bill of lading or shipping document a provision avoiding its liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery," id. § 30704. Although the plain language of the statute does not specifically exclude inland carriage from its scope, numerous courts have concluded, albeit on distinguishable facts, that the Harter Act does not apply to the inland phase of a multimodal carriage, even when cargo is lost or damaged while

---

[15] Some courts have "incorrectly assert[ed]" that the Harter Act governs only domestic trade.  2A Benedict on Admiralty § 14, at 2-10-2-11 n.3 (7th. ed. rev. 2007) ("Benedict") (citing cases); see also Sompo, 456 F.3d at 71 (noting that the Harter Act applies in international shipments).  Prior to COGSA, the Harter Act applied to international trade, and COGSA by its terms does not "supersede[e] any part of the [Harter Act] . . . which would be applicable in the absence of this Act . . . prior to the time when the goods are loaded on or after the time they are discharged from the ship."  COGSA § 12.

in the custody and possession of the carrier or its agent. See Mannesman Demag Corp. v. M/V Concert Express, 225 F.3d 587, 593-94 (5th Cir. 2000); Suzlon Wind Energy Corp. v. Shippers Stevedoring Co., No. 07 Civ. 155, 2008 WL 686206, at *17 (S.D. Tex. Mar. 7, 2008); Great Am. Ins. Co. v. A/P Moller-Maersk A/S, 482 F. Supp. 2d 357, 360 (S.D.N.Y. 2007); Sony Computer Entm't Inc. v. Nippon Exp. U.S.A. (Illinois), Inc., 313 F. Supp. 2d 333, 337 (S.D.N.Y. 2004); Philips-Van Heusen Corp. v. Mitsui O.S.K. Lines Ltd., No. 00 Civ. 0665, 2002 WL 32348263, at *5 (M.D. Pa. Aug. 14, 2002); Abbott Chem., Inc. v. Molinos de Puerto Rico, Inc., 62 F. Supp. 2d 441, 448 (D.P.R. 1999); Colgate Palmolive Co. v. M/V Atlantic Conveyor, No. 95 Civ. 1497, 1996 WL 742861, at *3 (S.D.N.Y. Dec. 1, 1996); Jagenberg, Inc. v. Georgia Ports Auth., 882 F. Supp. 1065, 1071 (S.D. Ga. 1995).[16]

In all of these cases, the loss occurred after the completion of the ocean carriage, when the cargo was deemed "constructively" delivered. Although the Harter Act "typically [will not] apply during the inland portion of a multimodal shipment after 'proper delivery,'" 2A Benedict § 44, at 5-16, the loss in this case occurred before the ocean carriage, long before "delivery" of any sort. However, the principle that supports these holdings is broad-reaching and rests on the notion that there is a certain point inland (perhaps the dockyards) beyond which this maritime statute does not apply. See, e.g., Mannesman, 225 F.3d at 594 n.16 ("[T]he Harter Act is applicable to a carrier's liability pursuant to an intermodal contract . . . only to the extent that the obligations claimed to be violated are maritime."); Abbott Chem., 62 F. Supp. 2d at 448 ("Courts

---

[16] Moreover, noticeably absent from two recent Second Circuit cases involving liability for cargo lost during the inland portion of an intermodal shipment is any discussion of the applicability of the Harter Act to the particular facts of the cases. Hartford, 230 F.3d at 552-53 (involving loss during foreign inland carriage); Sompo, 456 F.3d at 75 (involving loss during domestic inland carriage).

have held that the Harter Act is a maritime law, and solely regulates the liability of seagoing carriers."); Jagenberg, 882 F. Supp. at 1077 ("[T]he Harter Act is at its core a maritime law; the Court is unwilling to rule that simply because private parties enter an intermodal agreement federal maritime legislation is thus extended far beyond its congressionally intended bounds.").

Nonetheless, one court in this District has concluded that the Harter Act applied to invalidate (or at least modify) a contractual provision governing liability for the loss of cargo hijacked on the foreign inland portion of an intermodal shipment, "shortly after" the goods left the shipper's possession. See Anvil Knitwear, 2001 WL 856607, at *2. The Court reasoned that the Harter Act governs "for the period between when the carrier accepts the goods and when they are loaded on the vessel," and therefore governed the inland loss. Id. (citations omitted).

Although the majority of the cases addressing the issue have concluded that the Harter Act does not apply to inland portions of intermodal carriage (even when the shipment is still in the carrier's possession and control), the Supreme Court's recent decision in Kirby, rejecting a rigid "spatial approach," 543 U.S. at 24, for determining whether contracts are "maritime in nature," 543 U.S. at 26, may call into question the logic upon which these cases rest. Given the "new era" of "multimodalism," "cargo can move easily from one mode of transport to another," and maritime commerce "is often inseparable from some land-based obligations." Id. at 25. While Kirby did not discuss the scope of the Harter Act, it may suggest that courts should rethink its scope, especially given the seamless integration of different forms of carriage into "door to door" shipments, and where, as here, the language of the statute does not compel a reading as narrow as many courts have given it. Kirby expanded the inland reach of general maritime law on the basis that "the shore is now an artificial place to draw a line," id. at 25;

given this expansion, the continued viability of restricting the scope of an otherwise applicable federal statute on the basis of such an artificial line, thereby leaving a gap between the reach of general maritime law and the reach of the Harter Act, may be questioned.  Cf. 2A Benedict § 14 at 2-13-2-14 & n. 14.1; id. § 44 at 5-16-5-17 & n.19 (noting that "general maritime law" may govern "when the loss occurs during inland carriage within the United States" and that "[w]hen the loss occurs during inland carriage in a foreign country, but the litigation takes place in the United States, the loss may well be governed by foreign law . . . depend[ing] on the relevant choice-of-law rules").  However, the Court need not decide whether the Harter Act applies here because, even assuming that it does, it would not invalidate the $500 liability limitation.

3.    The Harter Act Applied

Even if the Harter Act applied in this case, plaintiff's argument still founders, because the Harter Act does not invalidate provisions *limiting* a carrier's liability, but only those *absolving* a carrier of liability for its own negligence.  See The Ansaldo, 294 U.S. at 496-97 (noting that a carrier "cannot contract for relief from liability for his own negligence," but endorsing "valuation clauses" where "the rate is fixed with reference to the specified value, and if a greater be declared a higher rate will apply").  Unlike COGSA, the Harter Act does not specifically prohibit per package limitations of liability.  Instead, the Harter Act prevents a carrier's avoidance of liability.  46 U.S.C. § 30704.  Thus, contractual definitions of the "package" are less relevant in the context of the Harter Act than in the context of COGSA.  Through Clause Nineteen, GWF does not "avoid[]" liability, but merely limits it, and courts have consistently held that the Harter Act "does not preclude limitations of liability."  Wemhoener Pressen v. Ceres Marine Terminals, Inc., 5 F.3d 734, 739 (4th Cir. 1993).  "[A]s long as the carrier does not

avoid liability under the Harter Act, it can limit liability through the use of contract clauses . . . .
[A]s long as there is some liability, a package limitation is not an exculpation from liability
under . . . the Harter Act."  Starrag v. Maersk, Inc., 486 F.3d 607, 615-16 (9th Cir. 2007); see
also Antilles Ins. Co. v. Transconex, Inc., 862 F.2d 391, 393 (1st Cir. 1988); Sabah Shipyard
Sdn. Bhd. v. M/V Harbel Tapper, 178 F.3d 400, 408 (5th Cir. 1999).  Under the Harter Act,
"[a]lthough carriers [cannot] completely escape liability for their negligence in handling the
cargo, they [can] effectively limit their liability to a sum well below the actual damage suffered."
2A Benedict § 12 at 2-6.

These principles are well-established in this Circuit; where a carrier provides "that
liability before loading or after discharge would be limited to $500 per container unless a higher
valuation were declared and a higher rate paid, such a stipulation would . . . effectively limit[] a
carrier's liability.  Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 816 (2d Cir. 1971);
see also Stevens v. Cunard S.S. Co., 271 F. 306, 307 (2d Cir. 1921) ("When the owner declares
no value, and pays a minimum rate of freight, he should not recover more than the value agreed
upon in the bill of lading . . . ."); Hugetz v. Compania Transatlantica, 270 F. 90 (2d Cir. 1920)
(upholding liability limitation of $5 per package); Hohl v. Norddeutscher Lloyd, 175 F. 544 (2d
Cir. 1910).

Although the contents of the container may far exceed $500, the statute[17] and caselaw are clear, "as long as there is *some liability*, a package limitation is not an exculpation from liability under . . . the Harter Act." Starrag, 486 F.3d at 615-16 (emphasis added). The distinction between a low liability cap and an exemption from liability is not meaningless; it is "crucial" because "[a] limitation, unlike an exemption, does not induce negligence." Tessler Bros. (B.C.) Ltd. v. Italpacific Line, 494 F.2d 438, 443 (9th Cir. 1974).

Courts have routinely enforced clauses limiting liability because to do otherwise would "confer[] a windfall on the cargo insurer, . . . the true plaintiff here, if it based its premium on the assumption that [the carrier's] liability was limited to $500" during the inland portion of the journey. Leather's Best, 451 F.2d at 815. "[W]ithin the constraints" of the liability limits set by federal law, "the allocation of risk in shipping is a matter governed by contract, and one best determined by the explicit agreement of the parties." Binladen, 759 F.2d at 1016. Assuming Yak Pak knew of the $500-per-container liability limitation and had an opportunity to obtain supplemental coverage from GWF for a reasonable fee, the provision would be valid under the Harter Act.

---

[17] In its current form (enacted in 2006), the Harter Act prohibits clauses "avoiding" liability. 46 U.S.C. § 30704. In contrast, before 2006, the Act prohibited clauses that "relieved" a carrier of liability. See former 46 U.S.C. § 190. The terms are roughly equivalent; if anything, the current terminology is clearer in its reference to clauses that entirely absolve the carrier of liability than the language used when the earlier cases permitting limitations of liability were decided. In any event, there is no indication that Congress intended the 2006 change in terminology to change the substantive meaning of the statute.

E.    The "Fair Opportunity" Doctrine

Federal Insurance's final argument, on which it succeeds in avoiding summary judgment, is that the $500 per container clause is unenforceable because Yak Pak had no notice of the $500 per container limitation in advance of the shipment, and no fair opportunity to obtain supplemental coverage by declaring higher a value and paying a reasonable *ad valorem* charge. (See P. Opp. 8.)  The fair opportunity doctrine applies to contracts for carriage with common carriers, including maritime carriers, as a matter of federal "common law principles."  General Elec., 817 F.2d at 1024; see Pannell, 263 F.2d at 498.  The fair opportunity doctrine is a "federal common law doctrine developed in admiralty."  Hartford, 230 F.3d at 553.  As the Supreme Court has stated, it is "only by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained."  New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 135-36 (1953); accord General Elec., 817 F.2d at 1028.  The Court further explained that binding a shipper "by a limitation which she had no reasonable opportunity to discover would effectively deprive her of the requisite choice" and would "amount to a forbidden attempt to exonerate a carrier from the consequences of its own negligent acts."  Nothnagle, 346 U.S. at 136.

Liability limitations in maritime bills of lading apply where the carrier provides the shipper both with adequate notice of the liability limitation provisions and with an option to receive full coverage of the shipment for a reasonable *ad valorem* charge.  General Elec., 817 F.2d at 1028; see also Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing, 167 F.3d 99, 101 (2d Cir. 1999).  A carrier can make a prima facie showing through the language of the bill of lading

that it notified the shipper of the limitation and gave the shipper an opportunity to purchase excess coverage, and if it does, the shipper must demonstrate that it had no fair opportunity to declare additional value. General Elec., 817 F.2d at 1029.

           1.     Notice

On the present record, a reasonable factfinder could conclude that the "the carrier has [not] given adequate notice of the limitation of its liability to the shipper, thereby affording the shipper means of avoiding such limitation." General Elec., 817 F.2d at 1028.

GWF insists that Clause Nineteen of the bill provided plaintiff with adequate notice. Clause Nineteen provides that the carrier and its agents shall not:

> in any event become liable for any loss or damage to or in connection with the shipment in an amount exceeding U.S. $500 per Package . . . unless the value of such goods has been declared and inserted in the appropriate space on the other side of this Bill of Lading and any required extra freight charge has been paid therefor.

(BOL Clause 19.) The clause goes on to redefine the package from the box to the container. Although the front of the bill of lading has space for a shipper to declare the value of the cargo, it does not in any way indicate that the back of the bill redefines the operative "package" so as to reduce by up to a factor of more than two thousand the shipper's protection (and the carrier's exposure) during the inland carriage. See Encyclopaedia Britannica, 422 F.2d at 14-15 (invalidating a contractual provision on the back of the bill where there "was nothing whatever on the face of the carrier's short bill of lading to indicate" the existence of such a provision, and noting that "[i]t is impractical for a shipper to be compelled to make a detailed study of all of the fine print clauses of the carrier's regular bill on each occasion before it ships out a package").

Even assuming that the terms of the bill would be sufficient to put the shipper on adequate notice of the container limitation, GWF is still faced with the problem that the bill issued two days after the loss of the cargo. GWF insists that the terms of the bill are nonetheless enforceable. As Judge Weinfeld noted,

> Courts have, of course, held that parties may incorporate into their contract of carriage the terms of a bill of lading that has not yet issued, but these decisions rest on findings that the party against whom enforcement is sought was shown to have known or to have had a reasonable expectation that a particular bill of lading would issue.

Scott & Williams, Inc. v. Pittston Stevedoring Corp., 422 F. Supp. 40, 43 (S.D.N.Y. 1976). Here, the Court cannot conclude as a matter of law that Yak Pak knew or had a reasonable expectation that the particular provisions at issue would be incorporated into the bill.

Where the terms of the "form of bill of lading" were "concededly known" by the parties, and the parties "clear[ly] inten[ded] . . . to be bound by the [carrier's] bill of lading form," they may be so bound, even though the bill issued belatedly. Berkshire Knitting Mills v. Moore-McCormack Lines, Inc., 265 F. Supp. 846, 848 (S.D.N.Y. 1965). Here, though, a reasonable factfinder could conclude that Yak Pak did not know of the liability limitation that GWF seeks to enforce. GWF produces no evidence that the parties discussed the limitation provisions, that GWF informed Yak Pak in advance of the terms of the bill, that GWF sent a draft bill for plaintiff's review and approval, or that Yak Pak otherwise knew of the liability limitation. On the current record, a reasonable factfinder could conclude that the only actual notice that Yak Pak received in advance of the carriage was the shipping order. "Upon issuance of an initial receipt or booking document incorporating a bill of lading, the terms of the latter become part of the parties contract." A.P. Moller-Maersk A/S v. Ocean Express Miami, 550 F.

Supp. 2d 454, 468 (S.D.N.Y. 2008); <u>St. Paul & Marine Ins. Co. v. Hanjin Shipping Co., Ltd.</u>,

No. 99 Civ. 1791, 2001 WL 196754, at *2 (S.D.N.Y. Feb. 21, 2001); <u>The Toledo</u>, 30 F. Supp.

93, 97 (S.D.N.Y. 1939); <u>Mediterranean Marine Lines, Inc. v. John T. Clark & Son, Inc.</u>, 485 F.

Supp. 1330, 1335 (D. Md. 1980); <u>John Deere & Co. v. Mississippi Shipping Co.</u>, 170 F. Supp.

479, 481 (E.D. La. 1959).  However, the terms of the incorporation must be clear:

> the burden of providing a form of dock receipt that clearly
> identifies the unissued bill of lading to be incorporated into the
> contract of carriage rests heavily on the carrier, since the document
> sought to be incorporated is itself "a contract of adhesion prepared
> by the carrier."  This is especially so when the bill of lading
> contains a clause purporting to limit liability, for such clauses are
> construed strongly against the party sponsoring them if any
> ambiguity exists.

<u>Scott & Williams</u>, 422 F. Supp. at 43 (citations omitted).  Here the shipping order neither

incorporates the bill of lading by reference, nor specifically identifies the relevant liability

limitation provisions, and therefore could not have put Yak Pak on notice of the provision.  <u>See</u>

<u>Encyclopaedia Britannica</u>, 422 F.2d at 17.

GWF next argues that plaintiff should be deemed to have constructive knowledge of the

terms of carriage, or a "reasonable expectation that a particular bill of lading would issue."

<u>Scott & Williams</u>, 422 F. Supp. at 43.  Again, the argument fails because a reasonable factfinder

could conclude that Yak Pak had no reason to know of the liability limitation.  GWF submits no

evidence that Yak Pak and GWF regularly conduct business and regularly use the bill at issue

such that Yak Pak would be deemed to have knowledge of those standard terms from a prior

transaction.  <u>See</u> <u>Encyclopaedia Britannica</u>, 422 F.2d at 10; <u>Anvil Knitwear</u>, 2001 WL 856607, at

*2; <u>Garnay, Inc. v. M/V Lindo Maersk</u>, 816 F. Supp. 888, 894 (S.D.N.Y. 1993).  GWF insists

that Yak Pak should have been on notice of GWF's tariff, filed with the Federal Marine

Commission. However, GWF has neither produced the tariff so that the Court can examine its contents, Komatsu, Ltd. v. States S.S. Co., 674 F.2d 806, 811 (9th Cir. 1982) ("Assuming that a tariff gives a shipper constructive notice, it imparts notice only of what is contained in the tariff's language."), nor suggested that the particular provision at issue was required by law to be filed, La Salle Mach. Tool, Inc. v. Maher Terminals, Inc., 611 F.2d 56, 60 (4th Cir. 1979) (In the context of the Shipping Act, a statute separate from COGSA or the Harter Act, the public filing of a tariff "gives constructive notice only of those terms which are required by law to be filed.") (citation omitted); accord Federal Commerce & Navigation Co., Ltd. v. Calumet Harbor Terminals, Inc., 542 F.2d 437, 441 (7th Cir. 1976); Port of Tacoma v. S.S. Duval, 364 F.2d 615, 617 (9th Cir. 1966); Pacific S.S. Co. v. Cackette, 8 F.2d 259, 260 (9th Cir. 1925). GWF also insists that the terms of the bill are published on its website, but submits no affidavit or other evidence supporting the conclusion that the terms were available in 2006 prior to the shipment. On this record, and absent more thorough argument, the Court cannot conclude as a matter of law that Yak Pak knew or should have known of the liability limitation.[18]

---

[18] In Luckenbach S.S. Co. v. American Mills Co., the Fifth Circuit concluded that "a shipper, in the absence of a special contract, must be presumed to deliver his goods on the terms and conditions usually and customarily imposed by the carrier in the regular course of business." 24 F.2d 704, 705 (5th Cir. 1928). However, as Judge Weinfeld pointed out, in Luckenbach, the standard form at issue was "known to all shippers." Scott & Williams, 422 F. Supp. at 43 n.9. Here, in contrast, it is not clear that the form at issue was known to Yak Pak. In any event, even were this Court to read Luckenbach more broadly than did Judge Weinfeld, the Second Circuit has not explicitly adopted Luckenbach, and judging by the only Second Circuit case citing it, this Circuit has declined to adopt such an expansive conception of constructive notice. See Encyclopaedia Britannica, 422 F.2d at 20 (Hayes, J., dissenting).

## 2.	Fair Opportunity to Secure Extra Coverage

The carrier must not only notify the shipper of the liability limitation, but also "offer the shipper an *ad valorem* charge that is reasonable," in light of the "amount of risk assumed [by the carrier], i.e., the declared value of the goods." General Elec., 817 F.2d at 1028. Here, there is simply no evidence in the record regarding the terms of the alleged supplemental charge.

GWF proffers a certified translation of a letter in Spanish dated July 28, 2006, "confirm[ing] that Yak Pak declined security for the container that was offered to them by GWF prior to the container leaving [Yak Pak's] warehouse." (Barnett Decl. Ex. 3; see also D. Rule 56.1 Stmt. ¶ 9.) However, the letter cannot bear the weight that GWF places upon it. The parties agree that GWF offered and Yak Pak declined additional security (P. Rule 56.1 Stmt. ¶ 8), but whether Yak Pak had a "fair opportunity" to declare additional security depends not only on GWF offering additional security, but also on the offer being reasonable. Whether the offer was reasonable depends on the terms of the additional coverage, and such terms do not appear in the record. The document's translation provides only that the general manager of Yak Pak El Salvador "decided not to put custody to the container dispatched today." (Barnett Decl. Ex. 3.) As a reasonable factfinder need not conclude on the present record that the coverage offered was reasonable, it need not conclude that Yak Pak was given a fair opportunity to declare extra value.

## CONCLUSION

GWF cannot, at this stage, enforce the bill of lading clause absolving it of liability because the clause is ambiguous and must be construed against it as the drafter. GWF also cannot, at this stage, enforce the bill of lading clause limiting its liability to $500 for the container because a reasonable factfinder could conclude that Yak Pak did not know in advance

of the shipment that the limitation was to govern the carriage and was not given a fair

opportunity to obtain full coverage from GWF at a reasonable rate. Therefore, GWF's pre-

discovery motion for summary judgment must be denied.

SO ORDERED.

Dated: New York, New York
       August 1, 2008

GERARD E. LYNCH
United States District Judge